IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

BOARD OF COUNTY COMMISSIONERS
OF SANDOVAL COUNTY, NEW MEXICO,

      Plaintiffs,

02 JAN 14 PM 4: 20

v.                     Civil Cause No. CIV 01-0120 PK/WWD

FIRST UNION SECURITIES, as successor in interest
to Everen Securities; and ROYCE O. SIMPSON,

      Defendants.

---

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

    Defendants First Union Securities, Inc. ("First Union"), and Royce O. Simpson

(collectively "Defendants") submit the following proposed Findings of Fact[1] and Conclusions of

Law.

### I.    FINDINGS OF FACT[2]

    1.    Plaintiff (the "County") has regularly purchased long term Treasury STRIPS for

its investment portfolios since at least 1991, well before its dealings with Defendants.

    2.    The County purchased Treasury STRIPS from 1991 through 1999 through a

variety of different brokers.  During 1997 and 1998, when Mr. Simpson was associated with

Everen, the County was also purchasing STRIPS through another firm and a different individual

broker.

---

[1] Submitted contemporaneously, herewith, is the Parties' Stipulated Findings of Fact. There is considerable overlap
and duplication between the Stipulated Findings of Fact and the findings of fact proposed herein.

[2] Defendants' Proposed Findings of Fact are taken from pleadings, depositions, answers to interrogatories and
admissions on file, as more specifically set forth in Defendants' motion for summary judgment and supporting brief.

3.     The County adopted a formal Investment Policy effective September 21, 1992; a copy was provided to Mr. Simpson at the time the Everen account was opened. That policy permits investment in securities backed by the full faith and credit of the United States, and does not preclude investment in United States Treasury STRIPS.

4.     Under the Investment Policy, which was in effect throughout the period at issue in this case, the Treasurer of Sandoval County "has ultimate authority over the investment of public funds as outlined in this policy." The Treasurer's office also adopted formal Investment Procedures under which "[i]nvestments are to be made by the Investment Officer and authorized by the Treasurer and the Deputy Treasurer."

5.     In October 1992, the County sought and received an opinion from independent counsel concerning the propriety of its investments in STRIPS. In this opinion, Attorney Robert Strumor, one of the County's counsel in this case, concluded that investments in STRIPS were "legal and proper investments" under both New Mexico law and the County's Investment Procedures.

6.     On January 2, 1992, the County hired Cheryl Tucker as its Investment Officer. From that date until her termination in July 2000, Ms. Tucker functioned as the County's Investment Officer.

7.     Ms. Tucker received a copy of Mr. Strumor's opinion on the legality and propriety of the County's investment in STRIPS.

8.     At the time the County opened its account with Everen, the Treasurer executed a Trading Authorization in which the County certified that Ms. Tucker was "authorized and

empowered to purchase, sell, assign, deal in or transfer securities . . . on our behalf with your firm."

9.    Ms. Tucker made each of the trades at issue here on behalf of the County and was the County's duly authorized agent for each of the transactions. No one else from the County has any actual knowledge of the circumstances of any of the purchases or sales of STRIPS at issue in the case.

10.    Ms. Tucker had been purchasing Treasury STRIPS on behalf of the County for over five years by the time she made her first purchase from Everen in 1997. By the time of that first purchase through Everen, Ms. Tucker was very familiar with all the material characteristics of Treasury STRIPS. Specifically, at the time Ms. Tucker made each purchase on behalf of the County during 1997 and 1998 of a Treasury STRIP, she knew (a) that the STRIP would not earn interest during the period of the County's ownership; (b) that the STRIP was interest rate and market sensitive; (c) that the County's principal was at risk; and (d) that the County would have to hold the Treasury STRIP to maturity to receive the full value of the investment. Ms. Tucker also was aware that the County should not invest monies that it would need for government operations in Treasury STRIPS.

11.    Mr. Simpson and Ms. Tucker discussed Treasury STRIPS on many occasions over the years she did business with him. By the time of the County's purchases through Everen in 1997 and 1998, Ms. Tucker was well aware of all material facts concerning Treasury STRIPS. It was Ms. Tucker, not Mr. Simpson, who solicited each purchase of a Treasury STRIP on behalf of the County from Everen.

12.    As an employee of the Treasury Department of the County, Ms. Tucker was aware of the County's anticipated cash needs. At no time during 1997 or 1998 did Ms. Tucker purchase a Treasury STRIP on behalf of the County through Everen using funds which the County anticipated would be needed for operations. Rather, all the purchases were made from funds the Treasurer's Department had determined were available for investment.

13.    Mr. Simpson left the employ of Everen in January 1999. On February 6, 1999, the County transferred all securities held at Everen, including two Treasury STRIPS then held in the account, to another brokerage firm. Everen had nothing to do with the County after February 5, 1999.

14.    On March 9, 1999, the New Mexico State Auditor hand delivered a letter to the County following the Auditor's review of the County's audit work papers for the year ending June 30, 1998. The letter "noted that the County participates in certain investment practices that warrant additional evaluation," and requested certain documents (including investment policies, Board of Finance meeting minutes, broker contracts and broker monthly transaction statements). The County provided the requested information.

15.    By letter dated July 16, 1999, the New Mexico State Auditor faxed a "draft" Special Report to the County and requested a "response to the findings" within ten days. The draft Special Report concluded, among other things, that the County's investment in Treasury STRIPS was not only contrary to the County's Investment Policy, but was illegal under New Mexico law. In the draft Special Report, the State Auditor recommended that the "County Treasurer immediately cease and desist [these] speculative, illegal trading activities." The

County Manager, Debbie Hays, described the receipt of the draft Special Audit as a "red flag" concerning the County's investment practices.

16.     On August 3, 1999, the County Manager sent a packet of information concerning the County's investments to a third-party broker who had not done business with the County. She testified that she did so to get an outsider's view regarding the concerns being raised by the State Auditor.

17.     By letter dated August 6, 1999, the County responded to the State Auditor and defended the County's investment practices. The letter, signed by the Treasurer, indicated that the Treasurer had "reviewed the investment records, which were audited by your staff, with the County Manager and our Investment Officer," prior to formulating the County's response.

18.     As a result of the concerns expressed by the State Auditor, the County Manager met sometime in August or September 1999, with Ms. Tucker, the Investment Officer, and Joseph Lang, the then-chair of the Sandoval County Board of Commissioners, to discuss the County's investment practices.

19.     On August 16, 1999, the Sandoval County Board of Finance met, at which time the Treasurer requested the Board "to review the investment policy and make any changes to the existing policy."

20.     On August 25, 1999, the State Auditor issued his final Special Audit Report, which was directed to the County Treasurer and the members of the Board of County Commissioners. The final Special Audit Report again concluded that the County engaged in investment practices "that violate state law and good internal controls."

21.     The County was on notice before October 5, 1999 of all the facts concerning its investments in STRIPS which form the basis of its claims in this case.

22.     In this case, Plaintiffs challenge a total of eighteen STRIP purchases made by the County through Everen between February 26, 1997 and November 23, 1998. Sixteen of those STRIPS were sold by the County while it still had its account with Everen; the County made money on the sixteen trades completed through Everen. The County made a total of at least $271,298.171 on its purchases and corresponding sales made through Everen.

23.     Two STRIPS purchased by the County in October 1998 were transferred to another brokerage firm on February 6, 1999. Contrary to the trading pattern utilized by the County in 1997 and 1998, the County made the decision to hold onto those two STRIPS throughout 1999 and then to sell them at a loss between August 2000 and December 2000. Everen had nothing to do with the County's decision to hold these securities after February 6, 1999, or the decision to sell the two STRIPS for a loss in 2000.

24.     The markups charged by Everen on each of the Treasury STRIP purchases at issue here were reasonable, and in all cases less than the maximum rate permitted by Everen's then-existing guidelines for markup of long-term Treasury securities.

## II.     CONCLUSIONS OF LAW

### A.     The County's Claims Based Upon Unsuitability.

1.     Each of the County's claims for relief is based on the allegation that Mr. Simpson wrongfully and knowingly omitted to disclose certain material facts to the County Treasurer each time the County purchased a Treasury STRIP through Everen, thereby inducing the County's purchase of unsuitable investments.

2. Federal courts recognize an unsuitability claim as an alleged violation of § 10(b) and Rule 10b-5. <u>O'Connor v. R.F. Lafferty & Co.</u>, 965 F.2d 893, 897 (10th Cir. 1992). An unsuitability claim based upon a misrepresentation or omission requires that the plaintiff allege and prove "that in connection with the purchase or sale of a security – the broker made an untrue statement of a material fact, or failed to state a material fact, that in so doing, the broker acted knowingly with intent to deceive or defraud, and that plaintiff relied on the misrepresentations, and sustained damages as a proximate result of the misrepresentations." <u>Id.</u>; <u>see also</u> <u>Hotmar v. Lowell H. Listrom & Co.</u>, 808 F.2d 1384 (10th Cir. 1987).

3. In this case, as to each purchase by the County of a Treasury STRIP between July 1997 and November, 1998, the record shows that Cheryl Tucker, the County's duly authorized agent, was aware at the time she purchased each Treasury STRIP of each fact the County now alleges was not disclosed. The record further shows that Mr. Simpson did not make an untrue statement of a material fact, or fail to state a material fact to the County with respect to the purchases at issue.

4. The County thus has not proven an essential element of its claim, i.e., that Mr. Simpson omitted to tell the County certain material facts in connection with the purchase or sale of any STRIP, thereby inducing the purchase or sale. <u>O'Connor</u>, 965 F.2d at 897. In addition, the evidence shows that the County did not rely on any alleged omissions by Mr. Simpson or Everen with respect to the transactions at issue, but instead made the purchase based on Ms. Tucker's own assessment of the propriety of each purchase.

5. Because each of the County's claims depends upon allegations of unsuitability which the County has not proven, judgment should be entered in favor of Defendants and against the County on each of the claims.

**B. Statute of Limitations**

1. The County's federal securities fraud claims are subject to a one-year statute of limitations. <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson</u>, 501 U.S. 350, 359-60 (1991) (An action claiming a violation of Rule 10b-5 must be filed "within one year after the discovery of the facts constituting the violation and within three years after such violation").

2. In the Tenth Circuit, "inquiry notice" triggers an investor's duty to exercise reasonable diligence, and the one-year statute of limitations begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud. <u>Sterling v. Biomune Systems</u>, 154 F.3d 1191, 1201-02 (10th Cir. 1998) A plaintiff "need not have fully discovered the nature and extent of the fraud before he was on notice that something may have been amiss." <u>Id.</u> at 1203 (quotations omitted).

3. Here, the County filed its original complaint on October 6, 2000. The undisputed facts demonstrate that the County not only should, in the exercise of reasonable diligence, have discovered, but in fact <u>did</u> discover, all the facts underlying what it now claims was fraudulent conduct well before October 6, 1999, one year before the initial Complaint was filed.

4. The County Investment Officer and Treasurer knew at the time of each transaction exactly what the County had bought from Defendants. Moreover, the County actually had its investment practices brought into question by a New Mexico regulatory agency more than one year prior to the filing of the initial complaint in this matter. Indeed, the County

-8-

had taken steps to review its practices internally, and had contacted an outside person for advice, all well more than one year before it filed suit.

     5.       Under the one-year statute of limitations of Lampf, Pleva, the County's federal securities claims are time barred.

## C.    Negligent Supervision

     1.       In order to prevail on a claim for negligent supervision, a plaintiff must establish that (1) an employee of the defendant engaged in a wrongful act that injured the plaintiff; and (2) the defendant was negligent in supervising that employee. Deflon v. Danka Corp., Inc., 2001 WL 13260, *11 (10th Cir. 2001). The County has failed to establish either element. As noted above, the Court has found that the Defendant Simpson did not engage in any wrongful act which injured the County. Moreover, the County has offered no evidence as to supervision of Mr. Simpson by Everen or as to the industry standard for such supervision. Thus, judgment will enter for the Defendant in connection with the County's negligent supervision claim.

## D.    Fiduciary Duty

     1.       A broker who merely executes trades orchestrated by his client has no fiduciary duty to the client concerning the suitability of those investments. de Kwiatkowski v. Bear Sterns & Co., 126 F. Supp. 2d 672 (S.D.N.Y. 2000). See also Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc., 769 F.2d 561, 567 (9th Cir. 1985) (recognizing distinction between brokers and investment counselors and the commensurate duties to advise customers regarding their investments).

     2.       Here, the evidence shows that Everen executed investment decisions orchestrated by Ms. Tucker on behalf of the County. Under such circumstances, no fiduciary relationship

arose which required Mr. Simpson or Everen to offer their opinion regarding the suitability of the investments. Moreover, since the investments were suitable for the County's investment portfolio, and permitted under the County's Investment Policy, the County has failed to meet its burden of proving the existence of a fiduciary duty, let alone a breach of that duty.

Respectfully submitted,

ROTHGERBER JOHNSON & LYONS LLP

Frederick J. Baumann, Esq.
Christopher T. Sullivan, Esq.
1200 17th Street, Suite 3000
Denver, Colorado 80202
Telephone: (303) 623-9000

and

KELEHER & MCLEOD, P.A.

By _____
W. Spencer Reid
Melanie L. Frassanito
P.O. Drawer AA
Albuquerque, New Mexico 87103
Telephone: (505) 346-4646
Telefax: (505) 346-1370

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of January, 2002, true and correct copies of the foregoing **DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** were hand delivered to the following:

Robert Strumor, Esq.
Hughes & Strumor, Ltd. Co.
320 Gold Avenue SW, Suite 1000
Albuquerque, NM 87102

John W. Higgins, Esq.
515 Roma, N.W.
Albuquerque, NM 87102

Melanie L. Frassanito

MLF0755