IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| BOARD OF COUNTY COMMISSIONERS OF SANDOVAL COUNTY, NEW MEXICO,<br><br> Plaintiff,<br>vs.<br><br>FIRST UNION SECURITIES, as successor-in-interest to Everen Securities, and ROYCE O. SIMPSON,<br><br> Defendants. | No. CIV 01-0120 PK/WWD |
|---|---|

## COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

 THIS MATTER came on for trial on February 11-12, 2002, before the Hon. Paul J. Kelly, Jr., sitting by designation. Plaintiff was present and represented by County Manager Debbie Hays and its attorneys Robert M. Strumor, Esq. and John W. Higgins, Esq. Defendants, First Union Securities, as successor-in-interest to Everen Securities, and Royce O. Simpson, were present and represented by their attorneys, Frederick J. Baumann, Esq. and Melanie L. Frassanito, Esq.

 Plaintiff presented its evidence, was heard fully and rested its case. Defendant moved for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c). The court being otherwise fully advised concluded that the motion was well taken and that judgment should enter in the Defendants' favor. Pursuant to Fed. R. Civ.

P. 52(a) & (c), the court makes the following findings of fact and conclusions of law.

## Findings of Fact

1. The Court has jurisdiction of the parties and the subject matter hereof.

2. Plaintiff (the "County") has regularly purchased long term Treasury STRIPS for its investment portfolios since at least 1991, well before its dealings with Defendants.

3. The County purchased Treasury STRIPS from 1991 through 1999 through a variety of different brokers. During 1997 and 1998, when Mr. Simpson was associated with Everen, the County was also purchasing STRIPS through another firm and a different individual broker.

4. The County adopted a formal Investment Policy effective September 21, 1992, Ex. 300; a copy was provided to Mr. Simpson at the time the Everen account was opened. That policy permits investment in securities backed by the full faith and credit of the United States, and does not preclude investment in United States Treasury STRIPS.

5. Under the Investment Policy, which was in effect throughout the period at issue in this case, the Treasurer of Sandoval County "has ultimate authority over the investment of public funds as outlined in this policy." Ex. 300 at 3. The Treasurer's office also adopted formal

Investment Procedures under which "[i]nvestments are to be made by the Investment Officer and authorized by the Treasurer and the Deputy Treasurer." Ex. 301 at ¶ no. 2.

6. In October 1992, the County sought and received an opinion from independent counsel concerning the propriety of its investments in STRIPS. Ex. 325. In this opinion, Attorney Robert Strumor, one of the County's counsel in this case, concluded that investments in STRIPS were "legal and proper investments" under both New Mexico law and the County's Investment Procedures.

7. On January 2, 1992, the County hired Cheryl Tucker as its Investment Officer. From that date until her termination in July 2000, Ms. Tucker functioned as the County's Investment Officer.

8. Ms. Tucker received a copy of Mr. Strumor's opinion on the legality and propriety of the County's investment in STRIPS and relied upon that opinion in making her investment decisions.

9. Ms. Tucker made each of the trades at issue here on behalf of the County and was the County's duly authorized agent for each of the transactions.

10. Ms. Tucker had been purchasing Treasury STRIPS on behalf of the County for over five years by the time she made her first purchase from Everen in 1997. By the time of that first purchase through Everen, Ms.

Tucker was very familiar with all the material characteristics of Treasury STRIPS. Specifically, at the time Ms. Tucker made each purchase on behalf of the County during 1997 and 1998 of a Treasury STRIP, she knew (a) that the County would not receive periodic interest payments from the STRIP; (b) that the market value of the STRIP was interest rate and market sensitive; (c) that the County's principal could be at some risk if the STRIP were not held to maturity and market interest rates "moved against her" (increased), and (d) that the County would have to hold the Treasury STRIP to maturity to receive the face value (full principal value) of the investment. Ms. Tucker also was aware that the County should not invest monies that it would need for current government operations in Treasury STRIPS.

11. Mr. Simpson and Ms. Tucker discussed Treasury STRIPS on many occasions over the years she did business with him. By the time of the County's purchases through Everen in 1997 and 1998, Ms. Tucker was well aware of all material facts concerning Treasury STRIPS. Ms. Tucker initiated all purchases and sales of STRIPS using Defendants as well as several other brokerage firms and individual brokers.

12. As an employee of the Treasury Department of the County, Ms. Tucker was aware of the County's anticipated cash needs. At no time during 1997 and 1998 did Ms. Tucker purchase a Treasury STRIP on behalf of

the County through Everen using funds which the County anticipated would be needed for current operations. Rather, all the purchases were made from funds the Treasurer's Department had determined were available for investment.

13. Mr. Simpson left the employ of Everen in January 1999. On February 6, 1999, the County transferred all securities held at Everen, including two Treasury STRIPS then held in the account, to another brokerage firm. Everen had nothing to do with the County after February 5, 1999.

14. On March 9, 1999, the New Mexico State Auditor hand delivered a letter to the County following the Auditor's review of the County's audit work papers for the year ending June 30, 1998. Ex. 311. The letter "noted that the County participates in certain investment practices that warrant additional evaluation," and requested certain documents (including investment policies, Board of Finance meeting minutes, broker contracts and broker monthly transaction statements). The County provided the requested information.

15. By letter dated July 16, 1999, the New Mexico State Auditor faxed a "Draft Special Audit Report on Investment Portfolio" to the County. The State Auditor requested a "response to the findings" within ten days. Ex. 312. The underlying audit included a review of broker transactions for January 1, 1997 through January 31, 1999. The draft

Special Report concluded, among other things, that the County's investment in Treasury STRIPS was not only contrary to the County's Investment Policy, but was illegal under New Mexico law. The draft Special Report also warned that the "County incurs significant unreported markups and broker fees associated with this type of trading" and the "County is incurring high risk in its investment strategy, and is paying a premium to do so." The State Auditor recommended that the "County Treasurer immediately cease and desist [these] speculative, illegal trading activities." The County Manager, Debbie Hays, described the receipt of the draft Special Audit as a "red flag" concerning the County's investment practices.

16. The State Auditor came to these conclusions largely based upon data furnished by the County. See id. ("Scope and Methodology").

17. On August 25, 1999, the State Auditor issued his final Special Audit Report, which was directed to the County Treasurer and the members of the Board of County Commissioners. The final Special Audit Report again concluded that the County engaged in investment practices "that violate state law and good internal controls."

18. Although the County would later engage the services of an independent financial consultant to review its investments in December 1999 and receive a report on January 15, 2000, about those investments, the

County was on notice before October 5, 1999 of all the facts concerning its investments in STRIPS which form the basis of its claims in this case.

19. In this case, Plaintiffs challenge a total of eighteen STRIP purchases made by the County through Everen between February 26, 1997 and November 23, 1998.

20. The County has failed to prove with any reasonable methodology that the markups charged by Everen on the particular Treasury STRIPS purchased were excessive, the evidence indicates that the markups in all cases were less than the maximum rate permitted by Everen's then-existing guidelines for markup of long-term Treasury securities.

21. Confirmations of purchases and sales and statements sent by Defendants to the County revealed all information that was required by statute, rule or practice.

22. The Investment Officer was not aware of the precise markup charged by Defendants, but she knew that there were markups built into the prices in lieu of commissions payable to Defendants. Although sometimes brokers called her, with respect to each purchase or sale of a STRIP, she obtained quotes from different brokers so as to obtain the best price for the County. She placed orders with a particular broker only when that broker had the lowest price in the event of a purchase

or could obtain the highest net price in the event of a sale. In this way, she maximized the return of the County.

23. The State Auditor was mistaken in taking the position that STRIPS were not direct obligations of the U.S. government backed by the full faith and credit of the U.S. government. <u>See</u> <u>generally</u> 31 C.F.R. § 356.31; Bureau of the Public Debt Online, Stripped and Zero Coupons, at http://www.treasurydirect.gov/of/ofstrips.htm ("Are STRIPS safe investments? STRIPS are obligations of the Treasury and are backed by the full faith and credit of the United States.").

24. Given the state of the economy during the relevant period of time, investing a limited amount of County funds in STRIPS with proper monitoring was prudent and the County realized significant benefit, referred to as "stunning gains" by the County's own expert.

25. The County's Investment Officer at all times took into account, pursuant to the stated investment policy of the County, the safety, liquidity and earning ability of any investment made.

26. Defendants did nothing to induce the County or its agents to purchase Treasury STRIPS.

27. Defendants did not make any untrue statements of material fact nor did Defendants fail to state a material fact not known to the County's

Investment Officer in connection with the purchase and sale of the Treasury STRIPS at issue.

28. The County did not rely on any representation, misrepresentation or omission, and did not sustain any damage as a proximate result of any statements or omissions made by the Defendant through its representative Royce O. Simpson.

29. The County Investment Officer was at all times aware of all material facts in connection with the purchase or sale of any STRIP and did not rely on any representations made by Defendants; further, her knowledge of the alleged omitted material facts established that even had Defendants disclosed such facts, her investment decisions would not have been different.

30. The County filed its original complaint on October 6, 2000.

31. The County Investment Officer and Treasurer were fully aware from at least July 1999 of alleged irregularities in connection with the purchase and sale of Treasury STRIPS.

32. Defendants were not making discretionary trades for the County, rather they were merely executing trades as requested by the County Investment Officer.

## Conclusions of Law

Having made the foregoing Findings of Fact, the Court makes the following

Conclusions of Law.

1. The actions of the Defendants did not violate § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), or Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiff has failed to prove by a preponderance of the evidence any of the elements required for an unsuitability claim. See Banca Cremi, S.A. v. Alex. Brown & Sons, Inc., 132 F.3d 1017, 1032 (4th Cir. 1997) (elements of unsuitability claim); Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1031 (2d Cir. 1993) (same); O'Connor v. R.F. Lafferty & Co., 965 F.2d 893, 897 (10th Cir. 1992) (same). Defendants' conduct did not violate the "Know Your Customer Rule" (Rule 405) of the New York Stock Exchange or Article 3, Section 2 of the NASD Rules of Fair Practice.[1]

2. Although the failure to disclose excessive markups or commissions on debt securities may be actionable under § 10(b) and Rule 10b-5, see Grandon v. Merrill Lynch & Co., 147 F.3d 184, 193 (2d Cir. 1998); Ettinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 835 F.2d 1031, 1035-36 (3d Cir. 1987), the markups in this case were not proven excessive and the Defendants proved that the County Investment Officer did not rely upon Defendants to provide a reasonable markup;

---

[1] Now called Conduct Rule 2310. See Krull v. SEC, 248 F.3d 907, 912 n.5 (9th Cir. 2001).

she based her decisions on the purchase and sale prices of the STRIPS. See Banca Cremi, S.A. 132 F.3d at 1033 (relevant factors in deciding whether a markup is excessive), at 1037 (defendant rebutted any presumed reliance where plaintiff was unconcerned with defendant's income and based trading decisions only on the purchase price of the securities).

2. Alternatively, Plaintiff's claims under § 10(b) and Rule 10b-5 are barred by the one-year statute of limitations. Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991); Sterlin v. Biomune Systems, 154 F.3d 1191, 1201 (10th Cir. 1998) ("[I]nquiry notice . . . triggers an investor's duty to exercise reasonable diligence and . . . the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud.").

3. Although Plaintiff's state-law securities claims were not listed in the Pretrial Order, the court deems the Pretrial Order modified to encompass those claims given the course of this lawsuit and the absence of any prejudice to the Defendants. See Fed. R. Civ. P. 16(e). The actions of the Defendants did not violate N.M. Stat. Ann. § 58-13B-30(A) or (B), or Rule 405 of the New York Stock Exchange or Article 3, Section 2 of the NASD Rules of Fair Practice.

4.  Defendant First Union Securities as successor-in-interest to Everen Securities did not fail to supervise Defendant Royce Simpson and there was no violation of N.M. Stat. Ann. § 58-13B-30(C) or Rule 405 of the New York Stock Exchange or Article 3, Section 2 of the NASD Rules of Fair Practice.

5.  Properly monitored, the Treasury STRIPS purchased and sold by Sandoval County were not unsuitable investments under the investment customs and policy then in effect.

6.  Assuming a fiduciary duty was owed by Defendants to Plaintiff, said fiduciary duty was not breached.

7.  Judgment should enter in favor of the Defendants against the Plaintiff together with costs.

DATED this <u>19th</u> day of February 2002, at Santa Fe, New Mexico.

*Paul Kelly Jr.*
United States Circuit Judge
Sitting by Designation